## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JAKE KILLINGS, | ) | CASE NO. 1:15-CV-1290 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Jake Killings ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* ("Act"). This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In February 2007, Plaintiff filed an application for SSI, alleging a disability onset date of April 2004. (Transcript ("Tr.") 746.) The claims were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*) The ALJ denied Plaintiff's request, on the ground it was untimely and Plaintiff had failed to establish good cause for missing the deadline. (Tr. 178-179.) On February 12, 2009, the Appeals Council denied Plaintiff's request to review the ALJ's dismissal of his hearing request. (Tr. 180-181.)

Plaintiff thereafter filed a complaint in this Court seeking a remand for the purpose of obtaining an administrative hearing.  *See Killings v. Comm'r of Soc. Security*, Case No. 1:09CV845 (N.D. Ohio) (White, M.J.)  On July 31, 2009, the parties stipulated to remand the case to the Agency for a hearing.  (*Id.* at Doc. No. 13.)  Magistrate Judge Greg White issued a Judgment Entry remanding the case on August 3, 2009.   (*Id.* at Doc. No. 14.)

On remand, ALJ Dennis LeBlanc held two hearings on Plaintiff's application,[1] on September 10, 2010 and May 6, 2011.  (Tr. 13.)  Plaintiff participated in the hearings, was represented by counsel, and testified.  (Tr. 29-73, 100-149.)  A vocational expert ("VE") also participated and testified at both hearings, and a medical expert ("ME") testified at the May 6, 2011 hearing.  (*Id.*)  On June 8, 2011, the ALJ found Plaintiff not disabled.  (Tr. 13-22.)  On January 6, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 900-902.)

On February 28, 2012, Plaintiff filed a civil action in this Court to challenge the Commissioner's final decision.  *See Killings v. Comm'r of Soc. Sec.*, Case No. 1:12CV479 (N.D. Ohio) (Vecchiarelli, M.J.)  On November 6, 2012, the undersigned magistrate judge (to whom the parties had consented) issued a Memorandum Opinion & Order that the June 8, 2011 ALJ decision be reversed and the case remanded for further proceedings.  (*Id.* at Doc. No. 20.)  In particular, the undersigned ordered as

---

[1]The Commissioner asserts the proceedings before ALJ Blanc related to a subsequent application filed by Plaintiff on May 18, 2009.  (Doc. No. 22 at 2.)  However, ALJ Blanc's June 8, 2011 decision specifically states that it relates to Plaintiff's February 9, 2007 application.  (Tr. 13.)

2

follows:

> For the reasons given above, the court REVERSES the decision of the Commissioner and REMANDS this case to the ALJ for the following:
>
> 1. The ALJ must clarify whether Dr. Zeck's comment that the full scale score was a "minimal estimate" meant that all of Killings' WAIS-IV scores were invalid. If that is the case, the ALJ must obtain a valid intelligence test score.  If not, the ALJ must use the verbal comprehension score of 66 in determining whether Killings meets the Listing at 12.05(c). In either case, the ALJ must reconsider whether Killings meets that Listing.
>
> 2. The ALJ must reconsider whether the opinions of Dr. Plank should be given controlling weight and, if not, give good reasons for not doing so.
>
> 3. The ALJ must rephrase the hypothetical question to the VE to eliminate the restriction to a supposed individual who must avoid only "concentrated" hazards.
>
> **IT IS SO ORDERED**.

(*Id.* at Doc. No. 20 at 27.)

On January 14, 2013, the Appeals Council remanded the case to the hearing level for further proceedings.[2]  (Tr. 1043.)  The case was assigned to ALJ Penny Loucas, who conducted a hearing on June 18, 2013.  (Tr.  773-871.)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A VE also participated and testified.  (*Id.*)  On August 30, 2013, the ALJ found Plaintiff not disabled.  (Tr. 746-763.)  On April 29, 2015, the Appeals Council declined to assume

---

[2] In its Order, the Appeals Council noted as follows: "The claimant filed subsequent claims for benefits on March 27, 2012.  The Appeals Council's action with respect to the current claim renders the subsequent claim duplicate. Therefore, the Administrative Law Judge will associate the claim files and issue a new decision on the associated claims.  In compliance with the above, the Administrative Law Judge will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision."  (Tr. 1043.)

jurisdiction, and the ALJ's decision became the Commissioner's final decision.  (Tr. 719-724.)

On June 29, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision.[3]  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 20, 22, 23.)

Plaintiff asserts the following assignments of error:

1.  The ALJ's decision violates the Court's remand Order in three respects:

    a.  This Court ordered that Listing 12.05C for intellectual disability is not inconsistent with a diagnosis of Borderline Intellectual Functioning, yet the ALJ's decision repeated the error.

    b.  This Court found that Killings attended special education, yet the ALJ's new decision denied that fact.

    c.  The Court's order plainly stated, "the ALJ must re-ask the hypothetical question [about exposure to hazards] to the VE, rephrasing the question to eliminate the restriction to an individual who must avoid only "concentrated" hazards.  The ALJ failed to re-ask the hypothetical question eliminating the word "concentrated."  The ALJ's decision instead omitted any restriction on hazards, without explanation.

2.  The ALJ's decision finding of literacy is not supported by substantial evidence.  This error affects the Listing 12.05C finding and the completeness of the hypothetical question.

3.  CE Evans reported that Killings "would have significant difficulties performing multistep tasks in a workplace environment."  The ALJ gave "great weight" to CE Evans, yet without explanation omitted a

_____

[3] On June 29, 2015, Plaintiff filed a motion to reassign this matter to Judge Nugent (who was the assigned District Judge in the previous appeal, prior to the parties' consent) and the undersigned magistrate judge.  (Doc. No. 3.)  The motion was granted in July 2015.  *See* Doc. No. 6 and Non-Document Order dated July 15, 2015.

4

restriction against multistep tasks.

4.     Regarding physical limitations, the decision violated the agency's treating-physician rule by rejecting the reports of Dr. Plank without good reasons.

5.     Not only treating physician Plank, but also testifying medical expert Dr. Brahms and two State-agency reviewing doctors reported that Killings was limited to only 2-4 hours per day standing.  The decision found that Killings could stand for 6 hours.  The decision did not give a satisfactory explanation for rejecting the opinions of these doctors.

(Doc. No. 20.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Plaintiff was born in July 1965 and was 38 years old on the alleged disability onset date and 41 years old when the application was filed.  (Tr. 761, 999.)  He had at least a high school education and was able to communicate in English.  (Tr. 761)  He had past relevant work as a kitchen helper and a cleaner.  (*Id.*)

### B.     Medical Evidence

#### 1.     Medical Reports

The medical evidence through the date of the previous ALJ decision (June 8, 2011) is thoroughly and accurately set forth in Section II.B of the Memorandum Opinion & Order issued by the undersigned magistrate judge in *Killings v. Comm'r of Soc. Sec.*, Case No. 1:12CV0479 (N.D. Ohio) (Doc. No. 20.)  The Court will not repeat this medical evidence but, rather, incorporates that section of the undersigned's previous Opinion, which is attached as an appendix hereto.

With regard to the medical evidence post-dating the previous ALJ decision, the

record reflects the following.[4]  On August 1, 2011, Plaintiff presented to the emergency room ("ER") with suicidal thoughts.  (Tr. 1181-1194.)  He reported contemplating "jumping off a bridge" due to his mother's poor health and his financial problems.  (Tr. 1189.)  The ER nurse noted congruent affect, cooperative behavior, and normal speech, thought process, and thought content.  (Tr. 1190-1191.)  She also noted "average" intelligence.  (Tr. 1191.)  Plaintiff was diagnosed with adjustment disorder and discharged with a referral to the Nord Center for mental health counseling.  (Tr. 1184, 1188.)

Plaintiff presented to the Nord Center for an Adult Diagnostic Assessment by Bonnie Adams, LSW, on August 8, 2011.  (Tr. 1202-1211.)  He complained of "very bad depression" and reported crying spells, irritability, anger, and suicidal thoughts.  (Tr. 1202.)  The Assessment contains a notation that Plaintiff reported a "past manipulation of [the mental health] system while in prison," indicating he reported "he was [diagnosed] with schizophrenia so he would not have to be with general population." (Tr. 1204.)  As for physical health problems, Plaintiff stated he had "arthritis in half of [his] body," causing him difficulty getting out of bed on three occasions.  (Tr. 1207-1208.)

On examination, Ms. Adams found Plaintiff presented as "pleasant, euthymic, calm, and cooperative," with a logical thought process and full affect.  (Tr. 1209.)  She estimated his intelligence level to be "average."  (Tr. 1211.)  Ms. Adams diagnosed

---

[4] Plaintiff's grounds for relief relate principally to his lower back and knee pain, and alleged illiteracy and low cognitive functioning.  Thus, the Court will recount only the record evidence regarding these issues.

6

depressive disorder and assessed a Global Assessment of Functioning ("GAF")[5] score

of 61, indicating mild symptoms.  (Tr. 1209-1210.)  The record reflects Plaintiff

thereafter presented for counseling sessions at the Nord Center in November and

December 2011.  (Tr. 1215-1218.)

On December 28, 2011, Plaintiff presented to the ER with complaints of left sided

back and leg pain.  (Tr. 1219-1231.)  He underwent an MRI of his lumbar spine which

showed, in relevant part, the following:

> Vertebral bodies are normal in signal and height.  Degenerative changes
> at the displaces are noted throughout the lumbar spine from L1 down to
> L4.
>
> L2- L3: Left paramedian extruded disk at this level significantly effaces the
> thecal sac compromising the transiting left L3 nerve root in its lateral
> recess.  Left L2 nerve root escapes uncompromised.
>
> L4-L5:   A broad-based disk protrusion at this level effaces the thecal sac
> anteriorly in the midline and slightly more on the left side than the right.
> There is some compromise of the transiting L5 nerve root left side at this
> level.  The L4 nerve root escapes uncompromised.  There is mild
> narrowing of the central canal at this level felt to be less than 25%.
>
> No significant extradural defect seen at L1-L2, L3-L4, and L5-S1.  The
> conus is normal caliber and signal and terminates at the T12 L1 level.
> The paraspinal soft tissues unremarkable.

(Tr. 1228.)  Plaintiff also underwent an x-ray of his lumbar spine, which showed

degenerative changes without evidence of fracture.  (Tr. 1230.)  Plaintiff was diagnosed

_____

[5] The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments.  A GAF score between 61 and 70
indicates mild symptoms or mild difficulty in social, occupational, or
school functioning.  A recent update of the DSM eliminated the GAF scale
because of "its conceptual lack of clarity . . . and questionable psychometrics in
routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders*
(DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

with lumbar disk herniation and discharged with pain medication.  (Tr. 1224-1226.)

Plaintiff followed up with his primary care physician the next day.  (Tr. 1246.)  His physician (whose name is illegible) noted full strength, negative straight leg raising, and a "very good response to NSAID." (*Id.*)  He diagnosed a lumbar strain and advised Plaintiff to return in two weeks if the pain had not resolved.  (*Id.*)

Plaintiff returned approximately two weeks later, on January 10, 2012.  (Tr. 1244.)  He still complained of "lots of pain," but stated it was "better lying down."  (*Id.*)  His physician noted Plaintiff's lumbar strain was "resolving."  (*Id.*)  In February 2012, Plaintiff reported his "back pain seems to be improving but still c/o occasional slight pains going up spine, mostly when laying down."  (Tr. 1239.)  In May 2012, Plaintiff does not appear to have reported back pain and indicated he was doing Taebo for exercise.  (Tr. 1237.)

The record indicates Plaintiff received treatment for lower extremity edema and numbness in June 2012, although this appears to be related primarily to his diabetes.  (Tr. 1296-1300.)  In September 2012, Plaintiff complained of numbness in his right thigh "when he stands for long periods of time or going from a sitting to standing position."  (Tr. 1291.)  Jason Ridgel, M.D., noted normal strength and tone, normal deep tendon reflexes, normal lumbar range of motion, and negative straight leg raise.  (*Id.*)  Dr. Ridgel assessed lumbar region strain/sprain, prescribed Etodolac, and recommended stretching and heat to the affected area.  (*Id.*)

In October 2012, Plaintiff complained of piercing, lower back pain "in a persistent pattern for 3 weeks."  (Tr. 1288.)  He reported aggravation with lifting, prolonged standing and prolonged sitting.  (*Id.*)  On examination, Dr.  Ridgel noted "bilateral-

8

straight leg raise normal, normal strength and tone, no laxity or crepitus, normal lumbar spine movements, sensation normal and tenderness to palpation (left muscles)."  (*Id.*)  Dr. Ridgel diagnosed lumbar region sprain/strain and prescribed pain medication.  (*Id.*)

Plaintiff underwent an x-ray of his lumbar spine on October 22, 2012, which showed "multilevel degenerative changes as well as degenerative changes in the posterior facets of the lower lumbar spine."  (Tr. 1313.)  No acute fracture or spondylolysis was noted.  (*Id.*)

In March 2013, Plaintiff reported exercising regularly.  (Tr. 1315.)  He reported joint pain, but denied muscle aches.  (*Id.*)  On examination, Vikramjeet Kumar, M.D., noted no muscular tenderness.  (Tr. 1316.)

## 2.    Agency Reports

### a.    Physical Impairments

On August 5, 2009, state agency physician Esberdado Villaneuva, M.D., reviewed Plaintiff's medical records and completed a Residual Functional Capacity ("RFC") Assessment regarding his physical impairments.  (Tr. 547-54.)   According to Dr. Villaneuva, Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently; standing and/or walking for a total of four hours in an eight-hour work day; sitting for a total of about six hours in an eight-hour work day; and pushing or pulling without limitation.  (Tr. 548-549.)  Dr. Villaneuva cited the results of x-rays taken on December 31, 2007, October 10, 2008, and December 16, 2008 of Plaintiff's lumbar spine, feet, and knees as supporting his conclusions.  (Tr. 548-549.)  Dr. Villaneuva also opined Plaintiff was able to frequently climb ramps and stairs; frequently stoop; and occasionally kneel, crouch, and crawl.  (Tr. 549.)  He further found Plaintiff should never

9

climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards.

(Tr. 549, 551.)

On December 31, 2009, state agency physician W. Jerry McCloud, M.D.,

reviewed Plaintiff's medical records, noted Plaintiff had not alleged a worsening of his

condition, and affirmed Dr. Villaneuva's assessment.  (Tr. 579.)

Subsequently, on October 3, 2012, state agency physician Dimitri Teague, M.D.,

reviewed Plaintiff's medical records and completed an RFC assessment of Plaintiff's

physical impairments.[6]  (Tr. 1006-1007.)  Dr. Teague opined as follows:

> The RFC given is an adoption of the ALJ RFC dated June 8, 2011.  The
> RFC is being adopted under AR 98-4 (Drummond Ruling).
>
> Can perform light work, except stand and/or walk 4 hours of an 8 hour
> workday; sit for 6 hours of an 8-hour [workday]; freq climb ramps and
> stairs (but ladders, ropes and scaffolds), frequently stoop; occasionally
> kneel, crouch, and crawl; he would need to avoid hazards such as
> dangerous machinery or unprotected heights.

(*Id.*)[7]

### b.    Mental Impairments

On December 16, 2010, psychologist Thomas F. Zeck, Ph.D., performed a

consultative examination of Plaintiff at the request of the ALJ.  (Tr. 638- 643.)  Plaintiff

---

[6]  Although noting that Dr. Teague rendered his opinion in connection with a
subsequent disability application filed by the Plaintiff, the ALJ nonetheless
considered Dr. Teague's opinion and gave it "considerable weight" with the
exception that she did not adopt Dr. Teague's opinions that Plaintiff could only
stand and/or walk for 4 hours in an 8 hour day and must avoid hazards.  (Tr.
758.)

[7] The record also contains a physical RFC assessment from state agency
physician Leon Hughes, M.D., dated May 25, 2012.  (Tr. 993.)  The ALJ does not
specifically mention Dr. Hughes' opinion; however, it is identical to the October
2012 opinion of Dr. Teague.

reported he did not drive, as his license was suspended after an accident in 1983.  (Tr. 638.)  He stated he was seeking disability benefits due to knee trouble since 1984 and back trouble since 1998.  (*Id.*)  Plaintiff also reported he had been told he might need surgery for his back but that he rejected surgery as an option.  (*Id.*)  Plaintiff was vague and uncertain regarding much of his medical history and his condition.  He reported he last worked in 2003 at the Texas Roadhouse and was fired when his employer discovered he had a felony conviction.  (Tr. 640.)  Plaintiff did, however, mention a work attempt in 2008.  Although Plaintiff reported his back was sore during the interview, Dr. Zeck did not note any signs of discomfort.  (*Id.*)

Dr. Zeck found Plaintiff to be rambling and verbose, but relevant and coherent. (*Id.*)  Dr. Zeck also found him to be completely oriented, capable of counting backwards from 20 and capable of counting serial threes, although Plaintiff made four mistakes in counting serial sevens.  (Tr. 641.)  He was able to give five digits forward and three digits backward.  (*Id.*)  Plaintiff could not recall any of three items after five minutes; could not interpret any of the proverbs given him; and displayed borderline concentration, rote memory, immediate recall, reasoning ability, abstract thinking, logical thinking, and insight and judgment.  (*Id.*)  Plaintiff reported feeding his children, doing dishes, cooking, and cleaning but denied doing laundry or shopping.  (*Id.*)  He enjoyed fishing and watching football and occasionally went to church and visited friends.  (*Id.*)

Dr. Zeck administered the Wechsler Adult Intelligence Scale–IV ("WAIS–IV") and reviewed the results of an IQ test that Plaintiff had taken in 1998.  (Tr. 641.)  Plaintiff achieved a verbal comprehension score of 66, a perceptual reasoning score of 79, a

working memory score of 74, a processing speed score of 71, and a full scale score of

67.  (*Id.*)  Dr. Zeck summarized Plaintiff's condition as follows:

> [T]he results of this evaluation indicate that Jake Killings is applying for social security primarily because he states that he has problems with his lower back and has arthritis in his knees.  Both of these things keep him from being gainfully employed because he cannot do much in the way of physical work.
>
> He has evidently refused surgery according to what he stated but no information was supplied regarding his injury or his diagnosis....
>
> His speech was relevant and coherent although he was rambling at times. He does appear to be somewhat depressed because he is not working, he is not contributing, and he has financial issues.
>
> His judgment and reasoning abilities were within the borderline range.
>
> Intellectually, it is felt that he is likely to fall within the borderline range even though he had a WAIS–IV of 67.

(Tr.  642.)  Dr. Zeck attributed Plaintiff's full scale IQ score of 67, in part, to the fact that

he "seemed tentative, hesitant, and lacking confidence in himself and his abilities."  (*Id.*)

For this reason, Dr. Zeck described Plaintiff's full scale score of 67 as a "minimal

estimate of his intellectual functioning."  (*Id.*)

 In assessing Plaintiff's work-related abilities, Dr. Zeck wrote in relevant part as

follows:

> 1. This claimant's mental ability to relate to others including fellow workers and supervisors is felt to be adequate. He was friendly and basically cooperative during this evaluation and offered no resistance or hostility.
>
> 2. This claimant's mental ability to understand, remember, and follow instructions appears to be moderately impaired as he appears to fall within the borderline range of intelligence classification. He was borderline in his concentration, rote memory, and immediate recall. He was also borderline in his general comprehension abilities in terms of his responses to hypothetical judgment situations.

3. This claimant's mental ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks did not appear to be impaired. There did not appear to be any significant problems that would suggest that he does have an inability in this area.

4. This claimant's mental ability to withstand the stress and pressures of a day to day work activity may be mildly to moderately impaired by his physical condition. It may be difficult for him to put forth a 40 hour work week at this particular time.  He might be given an opportunity to perform and see how well he does.

(Tr. 643.)

On September 27, 2012, state agency psychologist Todd Finnerty, Psy.D., reviewed Plaintiff's medical records and completed a psychiatric review technique and RFC assessment regarding his mental impairments.[8]  (Tr. 1005-1008.)  He found Plaintiff had mild restrictions in activities of daily living; mild restrictions in social functioning; moderate restrictions in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation.  (Tr. 1005.)  Dr. Finnerty concluded Plaintiff was moderately limited in his abilities to (1) remember locations and work-like procedures; (2) understand, remember, and carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (5) respond appropriately to changes in the work setting; and (6) set realistic goals or make plans independently of others.  (Tr. 1007-1008.)

---

[8]  The ALJ noted that Dr. Finnerty "gave [his] opinion during a subsequent application, but this opinion is highly relevant to [Plaintiff's] current functioning." (Tr. 757.)  The ALJ gave "great weight" to Dr. Finnerty's opinion and stated that "it is the basis for the mental limitations of this finding, as it is consistent with all mental status testing and the GAF scores from all providers."  (*Id.*)

In the narrative section of his report, Dr. Finnerty noted Plaintiff has a diagnosis of borderline intellectual functioning, a full scale IQ of 67, and "would need to perform simple, routine tasks."  (Tr. 1007.)  He also found Plaintiff "would need to work static tasks," where "he is not held to demands for a rapid pace" and "changes in job duties are infrequent."  (Tr. 1008.)  Finally, Dr. Finnerty stated:

> I have looked at the final findings of the ALJ MFRC from 06/08/11 and find that the new file does have new and material changes.  The ALJ MFRC is not being adopted because there are some new affective complaints that were not taken into consideration during the ALJ's decision.  The clmnt has since started some counseling for his condition and has [diagnosis] of adjustment [disorder] in addition to his learning disability.

(Tr. 1008.)[9]

On February 28, 2013, Plaintiff underwent a consultative psychological examination with Thomas M. Evans, Ph.D.  (Tr. 1272-1280.)  Plaintiff reported suffering from diabetes, arthritis, high blood pressure, cholesterol, and chronic lower back pain.  (Tr. 1276.)  He indicated he was seeking disability because he "pulled two discs in [his] back."  (Tr. 1275.)  Plaintiff stated he was placed in special education classes in the second grade.  (Tr. 1276.)  He claimed he had been psychiatrically hospitalized on three occasions, mostly recently for suicidal ideation.  (*Id.*)  He reported suffering from depression since 2001, with symptoms that included depressed mood, fatigue, lack of motivation, irritability, and crying episodes.  (Tr. 1276-1277.)

With regard to his activities of daily living, Plaintiff stated that he and his wife did

---

[9] The record also contains a psychiatric review technique and mental RFC assessment from state agency psychologist Jennifer Swain, Psy.D, dated May 23, 2012.  (Tr. 991-995.)  The ALJ does not specifically mention Dr. Swain's opinion; however, it is substantially similar to the September 2012 opinion of Dr. Finnerty.

14

the cooking, cleaning, and grocery shopping together.  (Tr. 1277.)  He described his typical day as follows: "I read the Bible, watch television, and do household chores." (*Id.*)  He reported that he did not have a driver's license.  (*Id.*)

On examination, Dr. Evans noted Plaintiff was fully oriented to person, place and time, and his grooming and hygiene were good.  (*Id.*)  Plaintiff ambulated within normal limits, "sat comfortably in his seat throughout the entire evaluation, and did not appear to be in any physical distress."  (*Id.*)  His eye contact and speech were normal, and Dr. Evans did not observe any evidence of anxiety or psychosis.  (*Id.*)  Plaintiff could spell the word "world" forwards and backwards; could recall three out of three words after a five minute delay; and could recite five digits forward and four digits backwards.  (*Id.*) Dr. Evans found Plaintiff's insight and judgment to be adequate.  (*Id.*)

Dr. Evans administered the WAIS-IV.  (Tr. 1278.)  Plaintiff achieved a verbal comprehension score of 63, a perceptual reasoning score of 75, a working memory score of 69, a processing speed score of 74, and a full scale score of 65.  (*Id.*)  Dr. Evans concluded as follows:

> Mr. Killings' Full Scale IQ Score of 65 places him in the extremely low classification, and at the first percentile.  Subtest scatter is not significant. All scores are well below average.  At the 90% confidence level interval, his true full scale IQ score is likely to fall between 62 and 69.  Based upon his diligence and persistence during testing this is believed to be a valid and reliable estimate of his current level of functioning.

(*Id.*)  He diagnosed depressive disorder and cognitive disorder, and assessed a GAF score of 55, indicating moderate symptoms.[10]  (*Id.*)

---

[10] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

Based on his Full Scale IQ score, Dr. Evans determined Plaintiff would have "significant difficulties remembering and carrying out complex instructions in workplace setting," but "does appear to be capable of completing simple instructions."  (Tr. 1279.) He found Plaintiff displayed good attention, concentration, and focus during the evaluation; however, "his score on the working memory index suggests that he would have significant difficulties performing multi-step tasks in a workplace setting."  (*Id.*) Dr. Evans noted no limitations in responding appropriately to supervision and coworkers.  (*Id.*)  He concluded that Plaintiff's "mood disorder, in and of itself, would not appear to prohibit employment at this time as it appears to be mild."  (*Id.*)

In a check-box form accompanying his written report, Dr. Evans opined that Plaintiff was markedly limited in his abilities to (1) understand, remember, and carry out complex instructions; and (2) make judgments on complex work-related decisions.  (Tr. 1272.)  He found Plaintiff was only mildly limited in his abilities to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions.  (*Id.*)

## C.  Hearing Testimony

### 1.  Plaintiff's Hearing Testimony

#### a.  September 2010 and May 2011 hearings

Plaintiff's testimony at the September 2010 and May 2011 hearings is thoroughly and accurately set forth in Section II.C of the Memorandum Opinion & Order issued by the undersigned magistrate judge in *Killings v. Comm'r of Soc. Sec.*, Case No. 1:12CV0479 (N.D. Ohio) (Doc. No. 20.)  The Court will not repeat its summary of this

16

testimony but, rather, incorporates that section of the undersigned's previous Opinion, which is attached as an appendix hereto.

### b.    June 18, 2013 hearing

During the June 18, 2013 hearing, Plaintiff testified to the following:

- He completed the twelfth grade and was in special education classes throughout high school.  (Tr. 783.)  He learned to read and write "just a little."  (Tr. 806.)  He was not able to write a grocery list or a letter well enough for someone else to understand it.  (*Id.*)  He was not able to read and comprehend a newspaper.  (*Id.*)  His ability to read and write has not improved since graduating from high school.  (Tr. 807.)

- He is able to add and subtract "just a little."  (Tr. 813.)  He cannot make change and just has to trust that people are giving him the correct change.  (*Id.*)

- He did not work during high school; however, one of his classes involved selling candy to his classmates.  (Tr. 784-786.)  He did not attend any school activities because he was "picked on" for being in special education classes.  (Tr. 789-790.)

- During the years he was in school, he dressed and bathed himself and brushed his own teeth.  (Tr. 786-787.)  He walked to school with his siblings and, as a general matter, did not encounter any difficulties getting to school.  (Tr. 788.)  He did not have any problems getting along with his classmates.  (Tr. 788.)

- He took a driver's test six months after he graduated from high school.  He did not pass because he was unable to read and write.  (Tr. 811.)

- He had a series of temporary cleaning jobs after graduating from high school.  (Tr. 795-797.)  In 2002 or 2003, he got a job as a dishwasher at Texas Roadhouse.  (Tr. 798.)  His wife helped him fill out the application.  (*Id.*)  During the job interview, he was given a quiz but did not pass it.  He was allowed, however, to take the quiz home and work on it with his wife.  (Tr. 799.)  He was hired for the job, and worked there for two and one half to three years.  (Tr. 800.)  He was fired when his employer discovered he had a felony conviction for domestic violence and carrying a concealed weapon.  (*Id.*)

- He is currently married and has two children, ages 4 and 10.  (Tr. 801-802.)  He wife does not work.  (*Id.*)  He spends time with his children and

changed their diapers when they were little.  (Tr. 803.)

### 2.  Medical Expert Testimony

There was no ME testimony during either the September 10, 2010 or the June 18, 2013 hearings.  During the May 6, 2011 hearing, orthopedic surgeon Malcolm Brahms, M.D., testified regarding Plaintiff's physical impairments.  (Tr. 32-39.)  Dr. Brahms stated Plaintiff is a "morbidly obese individual, who's a diabetic, claims to have hypertension, migraine headaches, abdominal pain, foot problems, knee problems, and headaches."  (Tr. 36.)  He opined Plaintiff does not meet or equal a Listing and "is capable of performing light duty."  (Tr. 38.)  Upon further questioning, Dr. Brahms explained as follows:

> Q:   All right.  And as far as Exh. 9F,[11] you said you agree with the opinion stated in that exhibit?
>
> A:   I do.
>
> Q:   But that exhibit specifically limits the claimant in this case to two hours of – or excuse me, I think they indicated four hours of standing and walking in an eight hour day.  What is your opinion with regard to the claimant's capacity for standing and walking throughout an eight hour day?
>
> A:   Oh, without question he's capable of at least four hours of standing and walking.
>
> Q:   So you agree with the assessment of four hours of an eight hour day?
>
> A:   I do.

(Tr. 38-39.)

_____

[11]Exhibit 9F is the Physical Residual Functional Capacity Assessment completed by state agency physician Esberdado Villanueva, M.D. , on August 5, 2009.  (Tr. 547-554.)

### 3.    Vocational Expert's Hearing Testimony

#### a.    September 10, 2010 and May 6, 2011 hearings

The Vocational Experts' testimony at the September 2010 and May 2011

hearings is thoroughly and accurately set forth in Section II.C of the Memorandum

Opinion & Order issued by the undersigned magistrate judge in *Killings v. Comm'r of*

*Soc. Sec.*, Case No. 1:12CV0479 (N.D. Ohio) (Doc. No. 20.)  The Court will not repeat

its summary of this testimony but, rather, incorporates that section of the undersigned's

previous Opinion, which is attached as an appendix hereto.

#### b.    June 18, 2013 Hearing

During the June 18, 2013 hearing, the VE testified Plaintiff had past relevant

work as a kitchen helper (DOT 318.687-010) (medium, unskilled, SVP 2) and cleaner,

housekeeper (DOT 323.687-014) (light, unskilled, SVP 2).  (Tr.  819, 823-824.)  The

ALJ then posed the following hypothetical:

> I want you to assume an individual similar to the claimant in age,
> education, and work history, who can engage in medium exertion; who is
> limited to occasional climbing of ramps and stairs, and occasional
> ladders, ropes, and scaffolds; who can frequently stoop; occasionally
> kneel, crouch and crawl.  As for mental, this individual can carry out– can
> understand, remember and carry out simple instructions consistent with
> performing unskilled work.  This individual can maintain concentration,
> persistence, and pace for unskilled work, so long as it does not require
> rapid machine pace or production type quotas; no limits on interacting
> with others, is limited to routine, minor, and infrequent type of changes in
> the workplace setting. * * * Would be best at a job that allows for a short
> demonstration of the tasks that the individual would be expected to
> perform.

(Tr. 832-833.)  The VE stated such an individual could perform Plaintiff's past work as a

kitchen helper and cleaner.   (Tr. 833.)

19

The ALJ then asked a second hypothetical that was the same as the first, but changed the exertional level from medium to light. (Tr. 833.) The VE testified such an individual could perform Plaintiff's past work as a cleaner and other representative jobs such as cafeteria attendant (light, unskilled, SVP 2) and parking lot attendant (light, unskilled, SVP 2). (Tr. 833-834.)

The ALJ then asked a third hypothetical that was the same as the first, but changed the exertional level to light and limited standing and walking to four hours a day. (Tr. 835.) The VE testified such an individual could not perform any of the previously identified jobs, but could perform the job of cashier (light, unskilled, SVP 2.) (Tr. 835-836.) When asked to identify other representative jobs that such a hypothetical individual could perform, the VE stated that "what I'm left with is looking at sedentary assembly jobs," which she described as "more difficult to secure." (Tr. 840.)

Plaintiff's attorney asked the VE regarding her understanding of the restriction to jobs that have a short demonstration of tasks. (Tr. 849.) The VE testified she understood this to mean "if the person couldn't understand it verbally, they could be shown." (Tr. 850.) Upon further questioning, the VE confirmed she did not interpret this restriction as meaning no reading or writing. (*Id.*)

### III. STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

20

which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The  claimant  has  not  engaged  in  substantial  gainful  activity  since

21

February 9, 2007, the application date (20 CFR 416.971 et seq.).

2.    The claimant has the following severe impairments: degenerative disc disease, borderline intellectual functioning, osteoarthritis, diabetes mellitus, obesity, and depression (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d) and 416.926.)

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except:

   •    He is limited to occasional climbing of ramps, stairs, ladders, ropes, and scaffolds.
   •    He can frequently stoop and occasionally kneel, crouch, and crawl.
   •    He can understand, remember, and carry out simple instructions consistent with performing unskilled work.
   •    He can maintain concentration, persistence, and pace for unskilled work so long that it does not require rapid machine pace or production type quotas.
   •    He has no limits on interacting with others.
   •    He is limited to routine, minor, and infrequent type of changes in the work place setting.
   •    Would be best at a job that allows for short demonstration of the tasks that the individual would be expected to perform at work.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on July **, 1965 and was 41 years old, which is defined as a younger individual age 18 through 49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964.)

8.    Transferability of job skills is not an issue in this case because the claimant's past relevant work in unskilled (20 CFR 416.968.)

9.    Considering the claimant's age, education, work experience, and

> residual functional capacity, there are jobs that exist in significant
> numbers in the national economy that the claimant can perform (20
> CFR 416.969 and 416.969(a)).

(Tr. 746-763.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports

23

the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.     Plaintiff's Assignments of Error**

**1.     The ALJ violated this Court's remand Order**

Plaintiff argues remand is required because the ALJ violated this Court's November 2012 remand order in three respects.  (Doc. No. 20.)  First, Plaintiff asserts the ALJ violated the remand order "by finding that a medical source must diagnose 'mental retardation' (now 'intellectual disability') to invoke Listing 12.05C."  (*Id.* at 15.)  Plaintiff claims the ALJ's finding on this issue directly contradicts this Court's previous conclusion that "Listing 12.05C does not require a diagnosis of mental retardation."  *See Killings*, Case No. 1:12CV479 (N.D. Ohio) (Doc. No. 20 at 21.)

Second, Plaintiff argues the ALJ violated the remand order "by finding that claimant did not attend special education classes (which is a key indicator of adaptive deficits before age 22)."  (*Id.* at 16.)  Plaintiff claims that, in its November 2012 Opinion & Order, this Court made the factual determination that Plaintiff attended special education classes throughout high school.  Plaintiff asserts the ALJ was bound by this factual determination on remand.  He also maintains the ALJ overlooked a second set of school records that contained the notation "special ed."  (*Id.*)  He claims that because the ALJ erred regarding special education, the decision makes a mistake of law and a finding contrary to substantial evidence by determining that there is no evidence to support an onset before age 22.  (*Id.*)

Third, Plaintiff argues the ALJ violated the remand order because she "without explanation failed to re-ask the hypothetical question about hazards."  (*Id.* at 17.)  He maintains (summarily) that "[t]he decision violates the Court's order by finding no

24

limitations whatsoever on exposure to hazards." (*Id.*)

The Commissioner argues the ALJ did not violate this Court's remand order. She maintains the ALJ satisfied the Court's Order with respect to Listing 12.05C because the ALJ did not question the validity of Plaintiff's IQ scores, opting instead to base her step three determination on the lack of evidence demonstrating adaptive deficits prior to age 22. (Doc. No. 22 at 8-9.) With regard to the ALJ's finding that Plaintiff was not in special education classes, the Commissioner asserts the ALJ was not bound by the prior ALJ's factual determinations and was permitted to make new factual findings and a decision based on her review of the complete record after remand. (*Id.* at 14-15.) Finally, for similar reasons, the Commissioner argues the ALJ was not bound by the prior ALJ's determination that Plaintiff must avoid hazards. She asserts that "on remand, the ALJ expressly found Plaintiff did not require a limitation that he avoid hazards" and, therefore, "there was no reason for the ALJ to include language regarding hazards in his RFC determination or in the hypothetical example to the [VE]." (*Id.* at 15.)

The Sixth Circuit has held that, where a federal district court has reversed the Commissioner's final decision and remanded the case for further proceedings, "it is the duty of ... the agency from which appeal is taken ... to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions." *Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967). As that Court later explained:

> In some Social Security cases, district courts will include detailed
> instructions concerning the scope of the remand and the issues to be
> addressed. In such cases, "[d]eviation from the court's remand order in

subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989).  *See also Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967) . . .  These cases stand for the proposition that the administrative law judge may not do anything expressly or impliedly in contradiction to the district court's remand order.

*Hollins v. Massanari*, 2002 WL 31398968 at * 2 (6th Cir. Oct. 17, 2002).

That being said, the Sixth Circuit noted in *Hollins* that "[t]hese cases do not preclude the ALJ from acting in ways that go beyond, but are not inconsistent with, the district court's opinion."  *Id*.  Indeed, courts have found that "as long as an issue was not finally decided in the District Courts, the ALJ can exceed the scope of a remand order and reconsider any evidence deemed appropriate in reaching a decision regarding a claim."  *Beatty v. Comm'r of Soc. Sec.*, 2015 WL 5693663 at * 3 (E.D. Mich. Sept. 29, 2015).  *See also Drossman v. Comm'r of Soc. Sec.*, 2008 WL 1848202 at * 6 (N.D. Ohio April 17, 2008) (Carr, J.) (finding that "*Hollins* explicitly allowed ALJs receiving a case on remand to move beyond the issues examined in the district court opinion" and "ALJs should not feel constrained to only consider the limited issues previously presented and specifically remanded for further consideration.")

With the above principles the mind, the Court now considers Plaintiff's three specific arguments.

### a.    Listing 12.05C

Plaintiff first argues the ALJ violated this Court's remand order by finding that Listing 12.05C requires a diagnosis of mental retardation.  Listing 12.05 sets forth the requirements for finding disability resulting from "intellectual disability."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.  In its first paragraph, Listing 12.05 provides the

diagnostic description of the impairment:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

*Id.* In other words, in order to satisfy the requirements of the Listing, an individual must, first, demonstrate the onset of the deficits described in the diagnostic description prior to age 22, and, second, satisfy the requirements of any one of the four subsections. *See Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 672, 676 (6th Cir. 2009) (noting that an IQ below 70 was not sufficient on its own to satisfy Listing 12.05, as the claimant must "still satisfy the three-prong definition of mental retardation" and one of the subsections).

As relevant to this case, an individual may satisfy the requirement of subsection (C) by demonstrating a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* Subsection (C), therefore, sets forth two requirements: (1) an IQ requirement; and (2) a significant limitation requirement. *See Switzer v. Colvin*, 2014 WL 2611945 at * 6 (N.D. Ohio June 11, 2014) (Vecchiarelli, M.J.).

The previous ALJ determined Plaintiff did not meet or equal Listing 12.05C because "although the claimant was assigned IQ scores of 61 and 67, these were not designated as valid scores." (Tr. 17.)  On appeal to this Court, the undersigned found as follows:

> Defendant's brief responds to Killings' arguments by asserting that Killings could not have been found disabled under Listing 12.05(C) because he did not exhibit the required deficits in adaptive functioning prior to age 22. As

27

the ALJ did not contest this point, the Commissioner's argument is irrelevant to whether the ALJ's opinion is supported by substantial evidence.

Defendant's brief also asserts that Dr. Zeck diagnosed Killings as being in the borderline range rather than retarded.  This, too, is irrelevant.  Listing 12.05(C) does not require a diagnosis of mental retardation.

The Commissioner, thus, responds to plaintiff's arguments by asserting arguments that the ALJ did not make and by supporting a position implied by the ALJ that is incorrect.  The Commissioner does not directly respond to plaintiff's position with respect to the uncertainty regarding Dr. Zeck's comment regarding the meaning of "minimal estimate" or regarding use of the verbal comprehension score of 66 as the proper measure of whether Killings meets the requirements of Listing 12.05(C).

At the very least, the ALJ should have inquired as to whether Dr. Zeck's comment that the full scale score was a "minimal estimate" meant that all of Killings' WAIS-IV scores were invalid.  If Dr. Zeck said that, indeed, all the scores were invalid, the ALJ should have had Killings re-tested, as recommended by *Brown*.  Given the ALJ's failure to clarify this portion of the record, his finding that Killings does not meet Listing 12.05(C) is not supported by substantial evidence.

*Killings*, Case No. 1:12CV479 (N.D. Ohio Nov. 6, 2012) (Doc. No. 20 at 21.)  Thus, this Court ordered that, on remand, the ALJ must do the following: "The ALJ must clarify whether Dr.  Zeck's comment that the full scale score was a 'minimal estimate' meant that all of Killings' WAIS-IV scores were invalid.  If that is the case, the ALJ must obtain a valid intelligence test score.   If not, the ALJ must use the verbal comprehension score of 66 in determining whether Killings meets the Listing at 12.05C.  In either case, the ALJ must reconsider whether Killings meets that Listing."  (*Id.* at 27.)

On remand, the Appeals Council noted Plaintiff had filed a subsequent claim for benefits in March 2012, and ordered the new ALJ (ALJ Loucas) to "associate the claim files and issue a new decision on the associated claims."  (Tr. 1043.)  The Appeals Council directed ALJ Loucas to offer Plaintiff "the opportunity for a new hearing, take

28

any further action needed to complete the administrative record, and issue a new decision." (*Id.*)

Plaintiff subsequently underwent a consultative psychological examination with Dr. Evans, which included additional IQ testing. (Tr. 1272-1280.) Plaintiff achieved a verbal comprehension score of 63, a perceptual reasoning score of 75, a working memory score of 69, a processing speed score of 74, and a full scale score of 65. (Tr. 1278.) Dr. Evans concluded that "[a]t the 90% confidence level interval, his true full scale IQ score is likely to fall between 62 and 69." (*Id.*) Dr. Evans further stated that "[b]ased upon [Plaintiff's] diligence and persistence during testing this is believed to be a valid and reliable estimate of his current level of functioning." (*Id.*)

ALJ Loucas thereafter conducted a hearing and issued a decision, which included consideration of medical evidence post-dating the previous ALJ's decision. In her decision, ALJ Loucas expressly considered whether Plaintiff met or equaled the requirements of Listing 12.05C. (Tr. 749-752.) After a lengthy analysis, the ALJ concluded Plaintiff did not meet this Listing because he failed to demonstrate deficits in adaptive functioning before the age of 22. In particular, she found as follows:

> Looking at the introductory paragraph for Listing 12.05C, it states: "intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." **There is no evidence to support or demonstrate such an onset, and absent the required diagnostic criteria, there is no need to evaluation [sic] any of the later criteria**. Since there is no objective, diagnostic or laboratory evidence in the record that addresses the claimant's adaptive functioning during the period of time prior to the claimant's ge of 22, the claimant's testimony is the only evidence that was proffered to prove the allegation that the claimant had deficiencies in adaptive functioning before the age of

22.

(Tr. 751) (emphasis added).  ALJ Loucas then addressed the record evidence regarding Plaintiff's educational history and activities of daily living prior to age 22.  The ALJ noted "the claimant's high school record contains no evidence or indication of special education, an individual education plan, or any IQ testing or psychological diagnosis." (*Id.*)  She observed Plaintiff attended three years of English, two of math, and four years of "something called occupational orientation," with grades "rang[ing] from As to Fs, with most grades Cs or Ds." (*Id.*)  The ALJ also noted, however, that Plaintiff "was frequently absent, peaking at 48 absences in his sophomore year, the only year he failed courses." (*Id.*)  The ALJ found that "[p]assing grades in mainstream, if vocationally oriented, course work shows that he did not have adaptive deficits." (*Id.*)

The ALJ also emphasized that, while in counseling at the Nord Center, Plaintiff denied special education classes or any other barriers to learning.  (Tr. 752.)  She cited evidence indicating Plaintiff's claims of illiteracy were not credible, including that he (1) indicated on a prison form that he was able to read and write; (2) had a driver's license, "which is evidence of an ability to read, write and comprehend sufficiently to answer correctly the questions needed to obtain a drier's license;" and (3) reported to Dr. Evans that on a typical day he reads the Bible, watches TV, and does household chores." (*Id.*)  The ALJ also noted that Plaintiff testified he dressed and bathed himself, walked to school, and was able to avoid danger.  (Tr. 751.)

The ALJ concluded "the claimant is not fully credible and while it is possible that he had a lower intellectual ability prior to the age of 22, there is no compelling evidence

30

in support, and strong evidence to suggest that the claimant was not lacking in adaptive functioning before the age of 22." (Tr. 752.) She further stated that:

> Perhaps most persuasive regarding the claimant's intelligence is the fact that despite having access to the IQ scores and education records, no medical source has diagnosed the claimant with intellectual disability or mental retardation. Multiple State agency psychologists, two examining psychologists, and a testifying medical expert physician all gave borderline intellectual functioning or a cognitive disorder as a diagnosis. (Exh. 9A p10, 11A p10). As discussed below, this lack of a formal diagnosis is not merely a legal formality, rather it shows that based on the medical evidence before them, no acceptable medical source found the claimant to have adaptive deficits consistent with intellectual disability. Rather, he has a low IQ but high adaptive functioning.

(*Id.*) Finally, the ALJ noted that "[i]n this case, **I am not questioning the validity of current IQ**, **but rather the existence of adaptive deficits prior to the age of 22."** (*Id.*)(emphasis added).

The ALJ did not violate this Court's remand order. As required by that order, ALJ Loucas obtained a valid intelligence test score on remand and reconsidered whether Plaintiff met or equaled the requirements of Listing 12.05C. This Court's remand order did not require ALJ Loucas to limit her step three analysis solely to the issue of whether Plaintiff had demonstrated a "valid verbal, performance, or full scale IQ of 60 through 70." Rather, the Court determined only that the previous ALJ's step three finding (i.e., that Plaintiff had failed to produce evidence of a valid IQ score in this range) was not supported by substantial evidence. On remand, ALJ Loucas acknowledged the validity of Plaintiff's February 2013 Full Scale IQ score of 65, and properly went on to consider whether he met the adaptive deficits criteria of Listing 12.05C. *See Hollins*, 49 Fed. Appx. at 536 (on remand, an ALJ is not precluded from

31

"acting in ways that go beyond, but are not inconsistent with, the district court's opinion).  *See also* 20 C.F.R. § 404.983 (upon remand by a federal court, "[a]ny issues relating to your claim may be considered by the [ALJ] whether or not they were raised in the administrative proceedings leading to the final decision in your case.")

Plaintiff nonetheless maintains remand is required because the ALJ "violated" the Court's Order by allegedly requiring a diagnosis of mental retardation to invoke Listing 12.05C.  Although the Court agrees that a formal diagnosis of mental retardation is not required to establish that a claimant meets or equals Listing 12.05C,[12] the ALJ did not base her step three finding solely on the lack of such a diagnosis.  Rather, the ALJ fully considered Listing 12.05C and thoroughly discussed a range of evidence to find that Plaintiff had failed to demonstrate deficits in adaptive functioning before age 22.

Accordingly, Plaintiff's assignment of error is without merit.

### b.    Special Education

Plaintiff next argues remand is required because "[t]his Court found that Killings attended special education, yet the ALJ's new decision denied that fact."  (Doc. No. 20 at 16.)  Plaintiff bases his argument on the following sentence in this Court's November 2012 Memorandum Opinion & Order: "The ALJ noted that Killings attended special education classes in school and that his grades consisted of mostly Cs, Ds, and Fs." *Killings,* Case No. 1:12CV479 (N.D. Ohio Nov. 6, 2012) (Doc. No. 20 at 18.)

---

[12]  The Sixth Circuit recently noted that, "although a diagnosis of [mild mental retardation] is not a necessary prerequisite to satisfy Listing 12.05, its absence is probative for a 12.05C determination.*" Peterson v. Comm'r of Soc. Sec.*, 552 Fed. Appx. 533, 539 (6th Cir. Jan. 21, 2014).

The Court rejects this argument.  Clearly, this Court did not make a factual determination that Plaintiff attended special education classes.  Rather, the Court simply stated that the previous ALJ had noted that Plaintiff attended special education classes.  *See* Tr. 15, 17, 19.  Plaintiff cites no legal authority to support the position that ALJ Loucas was not permitted to make a different factual finding from the previous ALJ on this particular issue.[13]  Moreover, there is absolutely nothing in this Court's previous Opinion that required ALJ Loucas to find that Plaintiff attended special education classes.  On remand, ALJ Loucas conducted a new hearing, accepted new evidence into the record, and issued a new decision based on the entirety of the record before her.  It was not inconsistent with this Court's remand order for ALJ Loucas to reach a different factual determination regarding whether Plaintiff attended special education classes.

To the extent Plaintiff argues ALJ Loucas' finding regarding special education is not supported by substantial evidence, the Court rejects this argument.  The ALJ thoroughly considered the evidence regarding this issue as follows:

> Mr. Roose argues that the claimant has a history of special education. (Exh. 23E p1).  The claimant's high school record contains no evidence or indication of special education, an individual education plan, or any IQ testing or psychological diagnosis.  His schedule shows three years of English, two of math, and four years of something called occupational orientation.  His grades ranged from As to Fs, with most grades Cs or Ds.  However, he was frequently absent, peaking at 48 absences in his sophomore year, the only year he failed courses. (Exh. 20E p1).  Passing grades in mainstream, if vocationally oriented, course work shows that he did not have adaptive deficits.  His high rate of absenteeism explains his

---

[13]Indeed, Plaintiff's counsel specifically acknowledged during the June 2013 hearing that ALJ Loucas was not bound to the previous ALJ's decision.  (Tr. 781.)

poor grades, as he missed nearly 1/3 of classes in his sophomore year.

Mr. Roose noted that he attempted to secure additional educational records, but the claimant's school district had no special education records from before 1975, and only limited records after.  (Exh. 24E p3).  The claimant was in high school in the early 1980s, and there is no indication from his record that he was in special education classes, aside from the letters EMR on his transcript, which possibly could stand for Educable Mental Retardation.  At the hearing, the claimant testified that he was in "ODR class," where they assisted the students in finding jobs.  He testified that he was in a 26 person class, and sold candy to other students to raise money, although he said that the other students picked on him and the other students in the special education program.

* * *

I note the counter evidence that he was in special education, namely that he denied it, and any barrier to learning at the Nord Center, discussed below.  I note that two different practitioners, one in an ER setting and another at Nord, estimated that his intelligence was in the average range. I note that he only reported a history of special education, or complained of any difficulty with concentration, when applying for benefits.  No treatment note contains any cognitive complaints of any kind.

(Tr. 751-752.)

Thus, the ALJ articulated a number of reasons to support her finding that

Plaintiff did not attend special education classes.  Plaintiff complains these reasons are

not supported by substantial evidence because the ALJ "overlooked a second set of

school records that were marked with 'special ed.'"  (Doc. No. 20 at 16.)  This

argument is rejected.  The fact that the ALJ did not specifically reference these records

in the decision does not necessarily mean that she failed to consider them.  Moreover,

the "spec. ed." notation that Plaintiff refers to is crossed out with an X, rendering it

unclear whether this document indicates Plaintiff actually attended special education

classes or not.  (Tr. 1117.)  This is simply insufficient to establish that the ALJ's factual

finding on this issue is not supported by substantial evidence.

Accordingly, the ALJ did not violate the Court's remand order by finding Plaintiff did not attend special education classes.  Moreover, this factual determination is supported by substantial evidence in the record.  Plaintiff's arguments to the contrary are without merit.

### c.  Hazards

Lastly, Plaintiff argues the ALJ violated the remand order because she "without explanation failed to re-ask the hypothetical question about hazards."  (Doc. No. 20 at 17.)  He maintains the decision "violates the Court's order by finding no limitations whatsoever on exposure to hazards."  (*Id.*)

In his RFC determination, the first ALJ (ALJ LeBlanc) concluded Plaintiff "would need to avoid hazards such as dangerous machinery or unprotected heights."  (Tr. 18.)  On appeal, Plaintiff argued that, although the ALJ found Plaintiff would need to avoid hazards when working, the ALJ's hypothetical question to the VE supposed an individual who had to avoid *concentrated* hazards.  Plaintiff argued ALJ LeBlanc's hypothetical did not properly include all of Plaintiff's limitations.

In the November 2012 Memorandum Opinion & Order, the undersigned addressed this issue as follows:

> The court cannot determine whether the use of 'avoid concentrated hazards' rather than 'avoid hazards' in the hypothetical question made any significant difference in the VE's estimate of the number of jobs in the national economy that Killings could perform.  As this case must be returned to the ALJ, the ALJ must re-ask the hypothetical question to the VE, rephrasing the question to eliminate the restriction to an individual who must avoid only 'concentrated' hazards.

*Killings*, Case No. 1:12CV479 (N.D. Ohio Nov. 6, 2012) (Doc. No. 20 at 26.)  The undersigned ordered that, on remand, "[t]he ALJ must rephrase the hypothetical

question to the VE to eliminate the restriction to a supposed individual who must avoid only 'concentrated' hazards."  (*Id.* at 27.)

As noted above, after remand, the Appeals Council ordered ALJ Loucas to consolidate the instant application with a subsequent application filed by Plaintiff; conduct a new hearing; and issue a new decision based on the entirety of the record before her.  (Tr. 1043.)  ALJ Loucas conducted a hearing in June 2013 during which she asked the VE several hypotheticals, none of which included any restrictions regarding hazards.  (Tr. 832-840.)  In her decision, ALJ Loucas found that "[a] review of the full evidence shows that the claimant need not avoid hazards. . . The claimant improved, with little musculoskeletal pain or treatment in the record after 2011."  (Tr. 758.)

The ALJ did not violate this Court's remand order by failing to include restrictions regarding hazards in the hypothetical question to the VE.  ALJ Loucas expressly determined the evidence did not support a limitation to avoid hazards.  She properly based her decision on the entirety of the record before her, which included hearing testimony and medical evidence that ALJ LeBlanc did not have before him.  Under these circumstances, it was not a violation of this Court's remand order for ALJ Loucas to reach a different conclusion regarding whether to include a limitation to avoid hazards in the hypothetical question and RFC.[14]  Accordingly, this assignment of error

---

[14] It is well established that, in fashioning a hypothetical question to be posed to a VE, an ALJ is required to incorporate only those limitations that she accepts as credible.  See *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (citing *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  Here, Plaintiff does not challenge the ALJ's finding that the evidence does not support a limitation against exposure to hazards.

is without merit.

**2.      Literacy**

In his second assignment of error, Plaintiff argues the ALJ's literacy finding is not supported by substantial evidence.  Noting the previous ALJ found him illiterate, Plaintiff argues ALJ Loucas "gave no clear reason to change the finding to literate." (Doc. No. 20 at 18.)  He further claims "the hypothetical's statement that Killings would be 'best at a job that allows for short demonstration of the tasks,' is vague and does not sufficiently account for Killings' illiteracy," particularly where the VE did not interpret this restriction as meaning no reading or writing.  (*Id.* at 18-19.)

The Commissioner argues "the ALJ did not have to explain how her reasoning differed from that of the prior ALJ" and, instead, "simply needed to support her findings and decision with substantial evidence."  (Doc. No. 22 at 16.)  She further asserts "the evidence discussed by the ALJ was more than enough to substantially support the determination that Plaintiff was sufficiently literate to complete work at the level assigned in her RFC determination."  (*Id.* at 16-17.)

The Court agrees with the Commissioner.  For the reasons discussed previously in this decision, ALJ Loucas was not bound by the prior ALJ's literacy determination. Nor is there anything in this Court's November 12, 2012 Memorandum Opinion & Order that required ALJ Loucas to adopt the previous ALJ's factual finding on this issue.

Moreover, the Court finds ALJ Loucas' literacy finding is supported by substantial evidence.  The regulations define illiteracy as the "inability to read or write." 20 C.F.R. 404.1564(b)(1).  The regulations further provide that "[w]e consider someone illiterate if the person cannot read or write a simple message such as instructions or

inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling." *Id.*  "A numerical grade level is properly used to determine a claimant's educational abilities only if contradictory evidence does not exist." *Skinner v. Sec'y of HHS*, 902 F.2d 447, 450 (6th Cir.1990).

In addition to the reasons discussed in connection with her determination regarding special education, ALJ Loucas articulated numerous reasons supporting her literacy finding as follows:

> At Exhibit 15F, in the record of Ohio Dept. of Rehabilitation and Corrections, there is a document entitled: "Inmate Testing Information Sheet L.O.R.C.I.  Mental Health and Education Department."  The claimant signed his name to the document and answered "Yes," to the question: "I have the ability to read and write English."  This is in direct contradiction to his assertion at the hearing that he could not read or write in English.  Other evidence further contradicts his assertion of illiteracy.  He had a driver's license which is evidence of an ability to read, write and comprehend sufficiently to answer correctly the questions needed to obtain a driver's license.  He told Dr. Zeck that he lost his license after an accident in 1983, and he has not been driving since. Ex. 16F.  Instead, he rode his bicycle frequently.  This is relevant evidence that he did not have deficiencies in adaptive functioning because he was physically and mentally capable of driving, and he could read and follow directional signage and street names as a means of going from one place to another.  Another significant inconsistency in the record which detracts from the claimant's credibility is his own statement that he made to Dr. Evans at a consultative examination in February of 2013, where he stated that on a typical day: "I read the Bible, watch TV, and do household chores."  Ex. 27F, pg. 7.

(Tr. 752.)  Later in the decision, the ALJ also noted that, in December 2008, a physician "told claimant to look up nutrition information at the library, and the claimant did not report difficulties with reading."  (Tr. 754.)

The ALJ acknowledges the results of a Beta-II test conducted in 1998 while

Plaintiff was in prison that showed a second grade reading level.[15]  (Tr. 755.)  The ALJ

gave less weight to this result, however, because it was not signed by an acceptable

medical source and "it is not routinely used in the psychological community."  (*Id.*)  The

ALJ also discounted this assessment on credibility grounds, noting Plaintiff "reported to

a therapist at the Nord Center that he manipulated mental health services while in

prison to gain a personal benefit" (i.e., he falsely reported he was diagnosed with

schizophrenia in order to avoid placement with the general population.)  (*Id.*)  The ALJ

found "the fact that the claimant was able to act in a convincing manner so that the

prison mental health providers believed he was schizophrenic is compelling evidence

that the claimant can be successful in misleading individuals and professionals as to

the true nature of his abilities and character."[16]  (Tr. 757.)

        Finally, the ALJ acknowledged Plaintiff's hearing testimony that he cannot read

simple English and is unable to prepare a grocery list or make change. (Tr. 759.)

However, she discounted this testimony as follows:

> [I]nformation from other records is contradictory to the claimant's
> testimony and allegations.  For example, in the Function Report prepared
> by the claimant's wife Garnetta Killings, she indicated that the claimant
> could count change.  (Ex. 30E pg. 4).  The only reason that was identified
> as a problem with his ability to handle money was simply his lack of having
> an income and therefore, not having access to money to manage.  Ex.
> 30E, pgs. 4-5. * * * He could pay attention "All day" and could follow
> written instructions if provided in a "step by step" fashion.  Ex. 30E, pg. 6.

---

[15] Cases have found that a person who reads below a third grade reading level
may be deemed "functionally illiterate."  *See e.g., Dantzer v. Comm'r of Soc.
Sec.*, 2011 WL 1113446 at * 5 (N.D. Ohio March 24, 2011) (Zouhary, J.) (citing
*Skinner*, 902 F.2d at 450.)

[16]Notably, Plaintiff does not challenge the ALJ's credibility finding in this case.

(*Id.*)

The Court finds the ALJ thoroughly considered the evidence regarding Plaintiff's reading and writing abilities and articulated numerous reasons for finding him to be literate.  In reaching this conclusion, the ALJ properly relied on Plaintiff's inconsistent statements regarding his ability to read and write, as well as evidence that he was able to graduate from high school and pass his driver's license test.  She addressed evidence suggesting Plaintiff had achieved only a second grade reading level and provided several reasons for rejecting it.  Plaintiff does not expressly argue, and cites no authority for the position, that the ALJ's rejection of that evidence was unreasonable.

Accordingly, the Court finds the ALJ's literacy determination is supported by substantial evidence in the record.  Plaintiff's argument to the contrary is without merit.

### 3.    Consultative Examiner Evans

Plaintiff next argues remand is required because the ALJ failed to address the opinion of consultative examiner Dr. Evans that Plaintiff "would have significant difficulties performing multi-step tasks in a workplace setting."  (Doc. No. 20 at 19.) The Commissioner argues Dr. Evans' report clearly indicates Plaintiff is capable of performing simple work and, therefore, is consistent with the RFC.  (Doc. No. 22 at 17-18.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i).  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists,

40

and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions.  (*Id.*)  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  (*Id.*)

As noted above,  Dr. Evans determined Plaintiff would have "significant difficulties remembering and carrying out complex instructions in workplace setting," but "does appear to be capable of completing simple instructions."  (Tr. 1279.)  He found Plaintiff displayed good attention, concentration, and focus during the evaluation; however, "his score on the working memory index suggests that he would have significant difficulties performing multi-step tasks in a workplace setting."  (*Id.*)  In a check-box form accompanying his written report, Dr. Evans opined that Plaintiff was markedly limited in his abilities to (1) understand, remember, and carry out complex instructions; and (2) make judgments on complex work-related decisions.  (Tr. 1272.)  He found Plaintiff was only mildly limited, however, in his abilities to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions.  (*Id.*)

The ALJ addressed Dr. Evans' report as follows:

> On February 28, 2013, the claimant saw Thomas Evans, Ph.D., who also reviewed the Nord diagnostic assessment.  (Exh. 27F p5).  The claimant reported that he was in special education since the second grade.  He also said he last worked in 2003, but then said that he began having problems concentrating at work in 2005.  When asked about depression, he reported consistent depression several days a week since 2001.  (Exh. 27F p6).  On a typical day, he reported that he reads the Bible, watches TV, and does chores.  His speech was normal, and he maintained good eye contact, with euthymic mood and affect.  He could spell the word "world" forward and backward, knew the current prior president, and could recall three out of three words after a five minute delay.  When tested for digit span, he could recall five digits forward and four back.  (Exh. 27F p7).  On the WAIS-IV, the claimant scored a 65 Full Scale IQ with a 63 Verbal Comprehension IQ, which Dr. Evans felt was valid.  He diagnosed the claimant with depressive disorder, not otherwise specified, and a cognitive disorder.  Again, he did not diagnose an intellectual disability.  Dr. Evans assigned a GAF score of 55, indicating moderate symptoms and his cognitive deficits.  (Exh. 27F p8).  Dr. Evans opined that the claimant had mild restrictions to simple work, but marked limitations to complex work and no social limitations.  (Exh. 27F, pp2-3).  I give this opinion great weight, and I limit the claimant to simple tasks.  The opinion is consistent with the findings from this exam and all other sources.

(Tr. 757.)

Plaintiff argues that, although the ALJ purported to give Dr. Evans' opinion great weight, she failed to address his specific opinion that Plaintiff would have "significant difficulties performing multistep tasks."  (Doc. No. 20 at 19-20.)  He argues the ALJ erred in failing to impose a restriction against multistep tasks in the RFC finding or the hypothetical question.  (Doc. No. 20 at 19-20.)

The Court rejects this argument.  The RFC contains multiple limitations restricting Plaintiff to simple, routine work, including that Plaintiff (1) can understand, remember, and carry out simple instructions consistent with performing unskilled work; (2) can maintain concentration, persistence, and pace for unskilled work so long that it does not require rapid machine pace or production type quotas; (3) is limited to routine,

42

minor, and infrequent type of changes in the work place setting; and (4) would be best at a job that allows for a short demonstration of the tasks that the individual would be expected to perform at work.  (Tr. 753.)  Plaintiff fails to explain how these limitations are inconsistent with Dr. Evans' opinion regarding multi-step tasks, or otherwise fail to accommodate his mental impairments.  This assignment of error is without merit.

### 4.  Treating Physician Timothy Plank, D.O.

Plaintiff next argues the ALJ failed to address, in any fashion, several of the opinions offered by treating physician Dr. Plank.  He further maintains that, "even as to the opinions of Dr. Plank that were discussed by the ALJ, the decision does not give good reasons for discrediting those opinions."  (Doc. No. 20 at 22.)  The Commissioner asserts the ALJ fully addressed Dr. Plank's opinions and articulated good reasons for discounting them.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.' "  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants

understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand. *Id.*

"The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002), citing *Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985).  Furthermore, it is well-established that administrative law judges may not make medical judgments.  *See Meece v. Barnhart,* 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)).  Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009); see also *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp.2d 807, 823-24 (N.D. Ohio 2009) (O'Malley, J.) ("Although the ALJ is charged with making credibility determinations, an ALJ 'does not have the expertise to make medical judgments.'")

Here, Dr. Plank completed a "Medical Source Statement: Physical Abilities and Limitations" form assessing Plaintiff's condition on August 12, 2010.  (Tr. 581–82.)  Dr. Plank opined Plaintiff could (1) stand for 15 minutes at a time and for a total of one hour in an eight-hour day; (2) sit for 30 minutes at a time and for a total of four hours in

an eight-hour day; (3) lift and carry up to five pounds occasionally and up to five

pounds frequently; (4) never stoop, balance, work around dangerous equipment,

operate a motor vehicle, or tolerate cold; and (5) only occasionally tolerate heat and

tolerate dust, smoke, or fumes exposure.  (*Id.*)  He also opined Plaintiff suffered from

extreme pain and his pain and limitations were the result of degenerative disc disease.

(*Id.*)  Dr. Plank stated Plaintiff was taking medications that would adversely affect work

performance and would be absent from work for four or more days per month due to

exacerbations of pain and the need to take pain medications.  (*Id.*)

In addition, according to Dr. Plank, Plaintiff would, during a typical workday,

constantly experience symptoms severe enough to interfere with attention and

concentration needed to perform even simple work tasks; needed a job that permits

shifting at will from sitting, standing, or walking; would have to take hourly unscheduled

breaks from working in an eight-hour day; and was incapable of performing even

low-stress jobs.  (*Id.*)  Dr. Plank concluded by opining Plaintiff was unemployable due

to severe, chronic lower back pain and neuropathy, illiteracy, poorly controlled

diabetes, obesity, and osteoarthritis.  (*Id.*)

In the decision, the ALJ recounted the medical evidence, including the record

evidence regarding Plaintiff's treatment history with Dr. Plank.  (Tr. 754-758.)  She

assessed Dr. Plank's opinion as follows:

> I give little weight to the opinion of Dr. Plank, given on August 2010.  He
> opined that the claimant was limited to less than sedentary work, could
> never work around hazards or cold, and would be absent four days a
> month from work due to exacerbations of pain.  (Exh. 12F).  Dr. Plank is a
> treating source, but this opinion is not due controlling weight because it is
> not consistent with substantial evidence, including claimant's frequent
> reports of being able to walk, and his testimony in September 2010 that he

45

shoveled snow and mowed the lawn.  Further, this opinion is not
supported by any clinical findings or lab results.  Dr. Plank's records show
only tenderness, with no radiculopathy.  Even the subjective complaints
Dr. Plank recorded show only intermittent pain complaints.  As for his
opinion that the claimant would be frequently absent, the claimant does
not consistently request or take narcotic pain medications at the level Dr.
Plank suggests.  Finally, Dr. Plank opined that the claimant could not even
perform low stress jobs, yet he never recorded any mental status findings
in any of his treatment notes, and there are no clinical signs that could
supports such an opinion.  I cannot give this opinion controlling weight due
to all of these inconsistencies and lack of support.  In September 2008, Dr.
Plank filled out Medicaid forms, which he noted that the claimant "needed
desperately."  (Exh. 8F p20).  This shows that Dr. Plank has a sympathetic
interest in the claimant, which colors his functional opinion.

(Tr. 758.)

Reading the decision as a whole, the Court finds the ALJ articulated good
reasons for according little weight to Dr. Plank's opinion.  The ALJ discounts Dr.
Plank's opinion as inconsistent with Plaintiff's reports of being able to walk, shovel
snow and mow the lawn.  The Court finds this reason to be supported by substantial
evidence in the record.  Dr. Plank's August 2010 opinion describes severe physical
functional limitations, including highly restrictive limitations on Plaintiff's abilities to
stand, sit, lift/carry, stoop, and balance.  During his hearing before the ALJ the very
next month, however, Plaintiff testified he was able to walk five or six miles to the store
with a 15 to 20 minute break, ride his bike, do push-ups and sit-ups, mow the lawn, and
shovel snow.  (Tr. 114-115, 120-122.)  It was not unreasonable for the ALJ to find this
testimony wholly inconsistent with Dr. Plank's opinions.

The ALJ also found Dr. Plank's opinions were not supported by clinical findings
and lab results.  Earlier in the decision, the ALJ discussed Dr. Plank's treatment notes,
which showed the following.  (Tr. 525-541, 645-684.)  Plaintiff complained of back pain

to Dr. Plank in January 2009, but denied radiation, numbness, weakness or tingling. (Tr. 530-531.)  In May 2009, Dr. Plank noted a benign physical examination. (Tr. 525.) The following month, Plaintiff complained of left side pain in his back and leg, and Dr. Plank detected mild paralumbar spasms.  (Tr. 680-682.)  While Plaintiff presented to Dr. Plank on several occasions between July 2009 and May 2010, Dr. Plank's treatment notes do not include any complaints of back or knee pain during this time period, although Plaintiff did complain of difficulty walking due to his obesity in November 2009.  (Tr. 655-679.)

On August 12, 2010, however, Plaintiff complained of "chronic low back pain" and stated he was "considering Social Security Disability due primarily to his back pain." (Tr. 652.)  Dr. Plank noted severely limited motion of the lumbosacral spine, diffuse tenderness, and no focal bony pain.  (*Id.*) That same day, Dr. Plank authored his opinion that Plaintiff suffered severe functional limitations, noting he was "unemployable" due to "severe chronic low back pain," illiteracy, diabetes, obesity and osteoarthritis.  (Tr. 581-582.)

These treatment notes, which are cited by the ALJ, provide further support for the ALJ's decision to accord "little weight" to Dr. Plank's August 2010 opinion.  As the ALJ correctly notes, Dr. Plank's notes indicate only occasional lumbar tenderness, which is inconsistent with his assessment of severe standing, sitting, postural and lifting restrictions.  Additionally, despite the fact Plaintiff presented to Dr. Plank frequently between October 2008 and August 2010, there are long periods during this time frame where Dr. Plank's treatment notes do not indicate any pain complaints, which is also inconsistent with Dr. Plank's assessment of disabling pain.  Moreover, while Dr. Plank

47

concluded Plaintiff's symptoms were severe enough to constantly interfere with attention and concentration and he could not perform low stress jobs, there are no indications of concentration deficits, difficulty focusing, or other mental status findings in Dr. Plank's treatment notes that are consistent with this extreme opinion.  Thus, the Court finds the ALJ's conclusion regarding the supportability of Dr. Plank's opinions is supported by substantial evidence in the record.

Plaintiff nonetheless asserts remand is necessary because "the decision did not even mention Dr. Plank's opinions about never stoop, never balance, only occasionally tolerate heat, symptoms would interfere with concentration, persistence, or pace 67% to 100% of the workday, need to shift positions at will."  (Doc. No. 20 at 22.)  The Court rejects this argument.  With regard to each of these limitations, Dr. Plank's opinion was based on his conclusion that Plaintiff suffered severe pain due to his lumbar degenerative disc disease.  (Tr. 581.)  Although the ALJ did not expressly discuss the particular limitations identified by Plaintiff above, she articulated "good reasons" for discounting Dr. Plank's assessment of the impact of Plaintiff's pain on his functional capabilities.  Read in this light, the Court finds the ALJ adequately addressed all of Dr. Plank's opinions and articulated good reasons for discounting them.

This assignment of error is without merit.

### 5.      Opinion Evidence regarding Plaintiff's ability to stand/walk

Finally, Plaintiff argues that none of the physician opinions in this case found Plaintiff could stand and/or walk for more than 4 hours during an eight hour workday. He complains the ALJ nonetheless "rejected the opinions of all those doctors and the prior ALJ about Killings' ability to stand and walk, instead finding that Killings could

48

stand and walk 6 hours per day."  (Doc. No. 20 at 25.)  He summarily concludes that "the reasons for disagreeing with Dr. Teague were cursory" and "[s]imilarly with Dr. Brahms the ME, Dr. Villanueva of the State agency was apparently not even mentioned."[17]  (*Id.*)

The Commissioner argues the ALJ properly addressed each physician opinion and explained that "because of improvements in Plaintiff's condition, reflected in his minimal reports of musculoskeletal pain or treatment after 2011, it is reasonable that Plaintiff is able to stand/walk for about six hours."  (Doc. No. 22 at 23.)

Here, the ALJ's RFC concluded Plaintiff could perform "light work" as defined in 20 CFR 416.967(b), with additional postural and mental restrictions.  (Tr. 753.)  The regulations provide that:  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).  "Since frequent lifting or carrying requires being on ones feet up to two-thirds of a workday, **the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8–hour workday**.  Sitting may occur intermittently during the remaining time." SSR 83–10, 1983 SSR LEXIS 30 (emphasis added).

The ALJ assessed the opinions of state agency physician Dr. Teague and ME

---

[17] Plaintiff's entire argument in support of this assignment of error is cursory at best, consisting of only two paragraphs.  It contains no discussion of the medical record and does not cite a single statute, regulation, case citation, or other legal authority.

49

Dr. Brahms, as follows:

> I give considerable weight to the October 2, 2012 opinion of Dimitri
> Teague, MD, the State agency reviewing physician.  He gave that opinion
> during a subsequent application, but Dr. Teague adopted the residual
> functional capacity from the June 2011 decision by ALJ LeBlanc.  (Exh.
> 11A p 8).  Notably, he opined that the claimant could only stand or walk for
> four hours a day.  I cannot adopt that finding, as that decision was
> vacated.  However, I agree that the claimant is limited to light work with
> some limitations to posturals.  A review of the full evidence shows that the
> claimant need not avoid hazards, and can stand/walk for four hours a day.
> The claimant, improved, with little musculoskeletal pain or treatment in the
> record after 2011.

> In May 2011, at a prior hearing, Malcolm Brahms, MD, testified as a
> medical expert.  He opined that the claimant could perform light work, and
> did not meet or medically equal a Listing.  I give this great weight, and
> while there is new evidence in the record, none of it contradicts his
> opinion.  For the reasons given above, I reject his opinion that the claimant
> can only stand/walk for four hours a day.  The claimant improved, with
> little musculoskeletal pain or treatment in the record after 2011.

(Tr. 758.)  As discussed above, the ALJ explicitly rejected Dr. Plank's opinion that

Plaintiff could stand for 15 minutes at a time and no more than a total of 1 hour.  (*Id.*)

The Court finds the ALJ properly considered the opinion evidence regarding

Plaintiff's capacity to stand/walk during an eight hour workday.  The ALJ acknowledged

the opinions of Drs. Plank, Brahms, and Teague regarding this issue and articulated

sufficient reasons for discounting them.  As discussed *supra*, the ALJ provided several

"good reasons" for discounting Dr. Plank's opinion that Plaintiff could stand for no more

than one hour during an 8 hour workday, each of which was supported by substantial

evidence in the record.  The ALJ also sufficiently articulated her basis for rejecting the

opinions of Drs. Brahms and Teague that Plaintiff could stand for no more than 4

hours.[18]  Specifically, the ALJ noted Plaintiff had improved, "with little muscoloskeletal pain or treatment in the record after 2011."  (Tr. 758.)  Plaintiff does not argue this is an insufficient basis for rejecting the opinions of Drs. Teague and Brahms, nor does he claim the ALJ's finding of improvement is not supported by substantial evidence.

Accordingly, this assignment of error is without merit.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: May 17, 2016

---

[18] Plaintiff claims the ALJ failed to address the August 2009 opinion of state agency physician Dr. Villanueva.  (Tr. 547-554.)  Among other things, Dr. Villanueva opined Plaintiff could stand and/or walk for a total of four hours in an eight hour work day.  (Tr. 549.)  Even if the ALJ failed to reference this particular opinion, any such error is harmless.  Dr. Teague offered the same opinion as Dr. Villanueva regarding Plaintiff's standing capacity, and the ALJ articulated sufficient reasons for rejecting that opinion.  Under these circumstances, it would be a pointless formality to remand.

51